# IN THE COURT OF APPEALS OF IOWA

No. 16-0971
Filed February 8, 2017

IN RE THE MARRIAGE OF SUMMER NADINE MARTIN
AND BLAINE DEAN MARTIN

Upon the Petition of
SUMMER NADINE MARTIN,
     Petitioner-Appellee,

And Concerning
BLAINE DEAN MARTIN,
     Respondent-Appellant.

_____

Appeal from the Iowa District Court for Van Buren County, Randy S. DeGeest, Judge.

The husband appeals from the economic and physical-care provisions of the decree dissolving his marriage. **AFFIRMED AND REMANDED.**

Michael D. Clark of Clark & Schroeder, P.L.L.C., North Liberty, for appellant.

Curtis R. Dial, Keokuk, for appellee.

Considered by Vaitheswaran, P.J., and Potterfield and Bower, JJ.

**POTTERFIELD, Judge.**

Blaine Martin appeals from the decree dissolving his marriage to Summer Martin. He maintains the district court should have granted him physical care of the parties' minor child rather than ordering the parties to share joint physical care. He also maintains the district court's division of the marital assets and liabilities was not equitable.[1]

**I. Background Facts and Proceedings.**

The parties were married in 1991. They raised two sons who reached the age of majority before Summer filed the petition for dissolution in 2014. The parties' third child, J.K.M., was born in 2005.

At the time of the dissolution hearing, in March 2016, one adult son continued to live with Blaine and the other continued to live with Summer. Each son helped care for J.K.M. when she was in the care of the respective parent. Blaine was working full-time first shift—Monday through Friday from 7:00 a.m. to 3:00 p.m. There were times he was required to work overtime, and he often did not have warning before it was required. Summer worked for the same company and also faced mandatory overtime. She worked full-time second shift, weekdays from 1:30 p.m. until 10:00 p.m. She hoped to switch to first shift when there was an opening, but it could be a number of years before that opportunity arose.

Pursuant to the ruling on temporary matters, filed in September 2014, the parties shared temporary joint legal custody of the child. Summer was granted

---

[1] Summer waived her option to file a brief in this matter. *See* Iowa R. App. P. 6.903(3) ("The appellee shall file a brief or a statement waiving the appellee's brief.").

temporary physical care of J.K.M., with Blaine getting parenting time every other weekend and otherwise as the parties could agree.[2]  During the following months, Summer rarely—if ever—agreed for Blaine to have extra time with the child.  However, in April 2015, Summer and Blaine reached an agreement whereby they consented to the modification of the ruling on temporary matters to a temporary shared care arrangement.  The new arrangement provided the parties alternating weeks with the minor child, with the exchange occurring on Sunday evenings.

Both Summer and Blaine testified that J.K.M. was doing well; she was enjoying activities such as soccer and softball, and she was excelling at school.  There had been a few issues with "unpleasant exchanges" when the parties were transferring J.K.M., but for the most part, Blaine and Summer had been able to successfully co-parent during the pendency of the proceedings.  They were able to discuss and reach agreements about what activities J.K.M. would participate in; her schoolwork; any medical needs; how to discipline J.K.M., if necessary; and more.  Even Blaine, who asked the court for physical care of J.K.M., testified that he and Summer had been doing well at co-parenting and J.K.M. was excelling in spite of the change in family dynamics.  Additionally, both parties agreed that it was best for J.K.M. to spend as much time with each parent as

---

[2] The court originally ordered the parties to attend mediation before the hearing set for temporary matters on September 26, 2014.  On September 25, Summer filed an application to waive mediation, claiming Blaine had refused to attend.  At the same time, Summer filed an affidavit requesting physical care of the minor child.  Blaine took no action regarding temporary matters, and on September 26, the court granted Summer physical care of the child.  Blaine's initial attorney filed a motion for reconsideration, claiming the attorney was unaware of any proceedings regarding temporary matters.  The court set a hearing on the motion, and Blaine's attorney failed to appear.  The court then overruled the motion.

possible, so each agreed Summer could spend mornings with J.K.M. when Blaine had to work, and Blaine could spend afternoons with J.K.M. when Summer had to work—even if it was not technically their respective times to spend with her.

The parties stipulated to the division of most of their assets. At the time of the hearing, the parties had not reached an agreement regarding how to divide their fifty percent ownership in "grandpa's farm,"—a farm with approximately 107 acres that was jointly owned with Blaine's brother and his brother's wife, and which contained the homestead where Blaine was currently residing. Additionally, Blaine testified he and his brother had an outstanding mortgage of approximately $60,000 for the various parcels of farmland and they had a $10,000 farm operating loan. Blaine's share of the monthly payment for the $60,000 was less than $400, and there was no monthly payment on the operating loan. Blaine also testified about a debt of $2898 to his sister, $20,315 to the estate of his mother, and $50,000 owed to his brother and his brother's wife for "how much more they've paid on these farms than" he and Summer had. Summer also testified about the money borrowed from Blaine's sister and Blaine's mother; she agreed the money had been used to pay various debts during the parties' marriage. She was unaware that $50,000 allegedly was owed to Blaine's brother.

The court issued the dissolution decree in April 2016. The court granted the parties joint legal custody and joint physical care of J.K.M. The schedule remained the same—alternating weeks with each parent, with the exchanges occurring on Sunday evening. Additionally, the decree provided, "During periods

of time that the other parent is at work, the non-working parent shall have the first opportunity to have the child in their care." Because Blaine and Summer earned similar salaries—but with Blaine earning slightly more—the court did not order either party to pay child support. Blaine was to provide medical insurance for J.K.M. until she "has attained age 18 or is still a full-time high school student or a full-time college student and has not yet attained age 26";[3] he was also ordered to pay the first $250 in uninsured medical or dental fees each year.

Blaine appeals.

## II. Standard of Review.

"We review claimed error in dissolution-of-marriage decrees de novo." *In re Marriage of Witten*, 672 N.W.2d 768, 773 (Iowa 2003). We decide the issues raised on appeal anew, but we give weight to the factual findings of the district court. *Id.*

## III. Discussion.

### A. Physical Care.

Blaine asked the court to give him physical care of J.K.M., and Summer asked the court to award the parties joint physical care of the child. Because one of the parties requested joint physical care, we consider whether that option is in J.K.M's best interests. *See* Iowa Code § 598.41(5)(a) (2014); *see also In re Marriage of Fennelly*, 737 N.W.2d 97, 101 (Iowa 2007). Where, as here, we have two capable, suitable parents, "[t]he critical question in deciding whether joint care is appropriate is whether the parties can communicate effectively on

---

[3] Technically, Blaine was originally ordered to provide medical insurance until J.K.M. reached age twenty-six. After he filed a motion to reconsider, the court amended the decree to read as stated above.

the myriad of issues that arise daily in the routine care of a child." *In re Marriage of Hynick*, 727 N.W.2d 575, 580 (Iowa 2007). Additionally, we also consider the following factors: (1) continuity, stability, and approximation; (2) "the ability of the spouses to communicate and show mutual respect"; (3) "the degree of conflict between parents"; and (4) "the degree to which the parents are in general agreement about their approach to daily matters." *In re Marriage of Hansen*, 733 N.W.2d 683, 697–99 (Iowa 2007).

Based on both Blaine and Summer's testimony, the parties have been largely successful in working together to co-parent J.K.M. since their separation. We acknowledge there were a few instances where Blaine spoke inappropriately to Summer, and there were times early in the proceedings when Summer was stubborn about allowing Blaine extra time with J.K.M. Otherwise, the parties have been able to come to agreements on how to divide holidays, how to discipline J.K.M. when needed, how to help the child improve her math grade, and many other daily parenting concerns. Additionally, both parents recognize the importance of the other in J.K.M.'s life.

Blaine maintains that "approximation" and "stability" weigh in his favor; he claims that he has been J.K.M's primary caregiver since Summer began working second shift, around the same time that J.K.M. entered school. We agree that Blaine has cared for J.K.M. more after school—he has made sure she gets to activities, is fed, and has completed her homework. He also makes sure she gets to bed on time. But Summer has historically spent an hour or two with J.K.M. each morning; she was the parent in charge of making sure J.K.M. was up, fed, and to school as needed. Both parents cared for and spent time with

J.K.M. on the weekends. Because these parents worked different shifts at their employment, they also tended to parent in shifts, and while Blaine tends to spend more time with J.K.M. each day, he and Summer have both cared for J.K.M. on a daily basis. Additionally, we note that the parents alternated weeks with J.K.M. for approximately one year before the decree was entered, and both parties agreed that J.K.M. thrived during this period.

Blaine's only other concern is that Summer has not or will not in the future foster his relationship with J.K.M. His real complaint seems to be that, before the parties agreed to share physical care, J.K.M. was often with one of her older brothers in the evening while Summer was at work rather than with him. We believe the decree provides a solution to this concern, as it contains a "first-refusal" provision, which allows Blaine to have J.K.M. any time Summer is working and unable to care for her. Joint physical care, in conjunction with the first-refusal provision, is in J.K.M.'s best interests; she is able to continue with a schedule in which she has thrived and which maximizes her time with each parent.

**B. Economic Provisions.**

Blaine appeals a number of economic provisions in the decree.

**1. Deductible for Medical Expenses.** Blaine maintains the court erred in ordering him to pay the first $250 of uncovered medical expenses. Iowa Court Rule 9.12(5) states, in pertinent part, "'Uncovered medical expenses' means all medical expenses for the child(ren) not paid by insurance. *In cases of joint physical care, the parents shall share all uncovered medical expenses in proportion to their respective net incomes*."

Here, the court found that Blaine earned $42,879 annually while Summer earned $37,000. Because the parties agreed their incomes were sufficiently similar that no award of child support was necessary, we presume the court intended to take into account Blaine's higher income in ordering him to be responsible for out-of-pocket medical expenses. Since Blaine appeals from that provision, we remand for the filing of child support worksheets and an award of child support, including provision for health insurance and responsibility for out-of-pocket medical expenses.

**2. Duration of Insurance.** Blaine maintains the district court erred with respect to the duration which he was ordered to provide medical insurance for J.K.M. Blaine is required to provide insurance for J.K.M. until she "has attained age 18 or is still a full-time high school student or a full-time college student and has not yet attained age 26."

Pursuant to Iowa Code section 252E.6(1), "A child is eligible for medical support for the duration of the obligor's child support obligation." The duration of a child-support obligation is limited by section 598.1(9), which states, in part:

> The [child support] obligations shall include support for a child who is between the ages of eighteen and nineteen years who is engaged full-time in completing high school graduation or equivalency requirements in a manner which is reasonably expected to result in completion of the requirements prior to the person reaching nineteen years of age; and may include support for a child of any age who is dependent on the parties to the dissolution proceedings because of physical or mental disability.

Blaine maintains the court exceeded its authority when it ordered him to provide medical insurance to J.K.M. while she attends college before reaching the age of twenty-six. We agree. Here, there was no evidence J.K.M. had a physical or

mental disability, and the statute otherwise limits the duration for which the court may order continued support.

3. **Division of Debts.** Last, Blaine maintains the district court's division of the marital debts was inequitable. Blaine maintains the court was wrong to determine some of the debts were not marital. He also maintains the court should have split all of the debts and ordered each party to pay half. He relies on the long duration of the parties' marriage and the fact that he is "significantly older than Summer and likely has fewer years left in the workforce."

In particular, Blaine maintains the court was wrong to make him entirely responsible for the all of the following marital debt: $30,000 on the farm note; $5000 for the farm operating loan; $2898 for the loan from his sister; $20,315 for the loan from his mother—now apparently owed to the estate; and $50,000 for the loan from his brother.

Like the district court, we do not believe there is a marital debt of $50,000 owed to Blaine's brother. Blaine mentioned this loan for the first time during his testimony; it was not included in previously submitted documents concerning the parties' debts and assets, and Summer testified she had no knowledge of such a debt. Similarly, although Blaine claimed he was responsible for $5000 of the $10,000 farm operating loan, Blaine testified that he was no longer taking an active part in the family farming and that it was his brother who owns and operates the cattle operation. The district court removed the $5000 from the marital debt, and we do likewise.

That leaves $30,000 on the farm note, $2898 to Blaine's sister, and $20,315 to Blaine's mother's estate. While the parties were ordered to share the

benefit of the farmland—with each party receiving one quarter ownership of the land—the court noted that Blaine got the added benefit of living on the homestead. The court stated, "At the time of the trial Blaine was living in the homestead on the farm and it was clear that he would continue to live in the farm. His monthly rent payment on the farm debt of less than $400 is very affordable." Meanwhile, Summer was paying rent for another home. We do not believe it is inequitable to order Blaine to make the minimal payment on the note in exchange for the added benefit of living on the farm.

Finally, Blaine maintains he should not have been responsible for the entire balance of the loans borrowed from his family members—$2898 to his sister and $20,315 to his mother's estate. Summer testified about the two loans in question, and she agreed the parties had borrowed those amounts in order to cover marital bills. We acknowledge Blaine testified he believed the money was borrowed in good faith and should be returned in good faith. That being said, it was unclear if the loans were ever going to be repaid; it had been a number of years since the money was borrowed, and the parties had not made any payments on the debt in the meantime. Moreover, there was no plan of how or when the debt would be repaid in the future. Additionally, as the court noted, Blaine is currently a beneficiary of his mother's estate, so even if that loan is repaid, he will receive one-third of that money back as one of three heirs of the estate.

Even if Blaine repays the approximately $16,500 he owes family members in likely unenforceable debt, the court considered the $17,852.35 Blaine received in his 401k and his undisturbed monthly pension, and found that overall the

division of assets and debts was equitable. We agree. *See Hansen*, 733 N.W.2d at 702 ("An equitable division is not necessarily an equal division.").

Blaine now complains that he would rather have his pension divided than have received so much of the debt; he claims the district court's offset "offers him little comfort" because he cannot yet access the funds he was awarded. Blaine could have asked the court to divide his pension and 401k; instead, he and Summer provided the court a stipulated agreement that provided he would receive those accounts in their entirety. We will not now entertain his complaints about getting what he asked for.

## IV. Conclusion.

We affirm the district court's order of shared physical care and the division of debts. We remand to the district court for an award of child support, payment for health insurance for the child, and a determination of the parties' responsibilities for and division of the uncovered medical expenses for J.K.M.

**AFFIRMED AND REMANDED.**